**HERCULES INCORPORATED, Plaintiff, Appellee, and Cross–Appellant,**

v.

**UTAH STATE TAX COMMISSION, Defendant, Appellant, and Cross–Appellee.**

No. 920548–CA.

Court of Appeals of Utah.

Dec. 31, 1992.

R. Paul Van Dam and Brian L. Tarbet, Salt Lake City, for defendant, appellant, and cross-appellee.

Keith E. Taylor, Maxwell A. Miller, and Randy M. Grimshaw, Salt Lake City, for plaintiff, appellee, and cross-appellant.

Before BILLINGS, JACKSON and RUSSON, JJ.

## OPINION

JACKSON, Judge:

Appellant (Tax Commission) appeals a decision of the Third Judicial District Court Tax Division entitling appellee (Hercules) to recover the tax in controversy plus interest. We reverse.

## FACTS

During the years 1977 through 1980, the United States Government had a contract with Lockheed Missiles & Space Company

(Lockheed) to build Trident missiles. Lockheed subcontracted with Hercules to build the missile motors.[1] Hercules manufactured the motors at its Bacchus, Utah facility. Upon completion of the manufacturing process, Lockheed, who had a business presence in Utah, inspected the motors and received title to them at the Bacchus facility. At this point, the subcontract items consisted of the unconnected first, second, and third stage motors of the missile— three canisters containing an explosive propellant in an inert form. The units were then shipped from Utah via common carrier, on a government bill of lading, to a military assembly facility at a seaport in one of several destination states. It was Lockheed's contractual obligation at each of these facilities to assemble the components of the missile. Hercules, under its subcontract, provided many support services at these facilities. Hercules was compensated by a cost-plan, fixed fee contract calling for partial payment upon delivery to Lockheed at Bacchus, as well as additional payment for services performed at the destination facilities. Payment was also based on component performance.[2] The contract provided for incentives rewarding good performance and penalties discouraging bad performance.[3]

In 1982, the Auditing Division of the Tax Commission issued a "Notice of Deficiency" to Hercules claiming additional Utah Corporate Franchise taxes were due for the years 1977 through 1980. On October 4, 1988, the Tax Commission, after a formal hearing, affirmed the audit deficiency. On November 2, 1988, Hercules paid $890,462.00 as a prerequisite to appealing the

decision to the Third Judicial District Court. *See* Utah Code Ann. § 59–1–505 (1987). Of that amount, $456,512.00 was paid under protest. On February 1, 1991, the district court reversed the Tax Commission's Final Decision and held that Hercules was entitled to a refund with interest on the taxes paid under protest. The Tax Commission appealed the case to the Utah Supreme Court, which transferred the case to us.

## ISSUE

This appeal involves the application of Utah Code Ann. § 59–13–93 (1967) to Hercules' sale of missile motors to Lockheed. The Uniform Division of Income for Tax Purposes Act (UDITPA), governs the amount of taxes payable to Utah when income is derived from both within and without the state. Utah Code Ann. § 59–13–79 (1967). The business income to be apportioned to this state is determined by "multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three." Utah Code Ann. § 59–13–86 (1967). The sales factor is a fraction, "the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period." Utah Code Ann. § 59–13–92 (1967). Sales of tangible personal property are "in this state" if the property is "delivered or shipped to a purchaser within this state regardless of the f.o.b. point or other conditions of the sale." Utah Code Ann.

---

**1.** Much confusion exists over the definition of "missile motor." Thus, it is important at the outset to distinguish between the missile motor, the missile propulsion subsystem, and the completed missile. The record and the subcontract show that the motor is essentially three large canisters filled with "tooled" explosives. The motor is a component of the propulsion subsystem. In addition to the motor, the propulsion subsystem consists of firing units, actuators, adaptor sections, and various other components. The propulsion subsystem, together with the re-entry bodies, the nose fairing and the nose cap, make up the completed missile.

**2.** A missile motor is not like a car motor. The missile motor is capable of being fired one time only. Once the motor is ignited the "tooled" explosives burn at a steady pace until they burn out. The missile cannot be test-fired to check performance. Consequently, performance-based payments are not received until the missile is actually deployed.

**3.** Lockheed had supervisors at the Hercules facility and Hercules had supervisors at the destination facility. Each had to "sign off" on the work completed by the other. This arrangement is necessary considering both stood to benefit financially from work done by the other if the missile performed successfully.

§ 59–13–93 (1967). The issue in this case is what tangible personal property was sold by Hercules to Lockheed.

## ANALYSIS

The trial court made several findings of fact concerning the subject matter of the sale. The trial court found that the "property" to be sold by Hercules to Lockheed under the subcontract was "a functional rocket motor, which could be fired when the manufacturing process was completed." The trial court found that upon the completion of manufacturing in Utah, the subcontract items "were not a 'rocket motor' or functional unit that could be fired," and at that point "the total manufacturing process of the motors being purchased was approximately 60% complete." The trial court further found "the manufacturing process was completed at the destination assembly facility."

■ We review a trial court's findings of fact under a clearly erroneous standard, giving great deference to the trial court's findings. *Grayson Roper Ltd. v. Finlinson*, 782 P.2d 467, 470 (Utah 1989); Utah R.Civ.P. 52(a). To successfully attack a trial court's findings of fact, an appellant must "demonstrate that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings." *Grayson*, 782 P.2d at 470.

■ We find the evidence insufficient to support the trial court's findings. The record clearly demonstrates that the subject of the Hercules–Lockheed subcontract was a missile motor with accompanying services. The motor is not functional when it leaves Hercules' Bacchus facility. It is only functional when it is assembled into a missile. The court erred when it found the subject matter of the Hercules sale to

Lockheed was a functional or usable motor that could be fired. In essence, the court found the subject matter of the sale to be a completed missile. This simply is not the case. Lockheed, as the prime contractor, sold completed missiles to the government. Hercules, as a subcontractor, sold a motor that was a component of the missile's propulsion subsystem.

The trial court found that the motor was not functional when it left Hercules' Bacchus facility, that the manufacturing process was only 60% complete, and that the manufacturing process would not be fully complete until further work was performed at the destination facility. It is clear from the record that the trial court has confused the missile motor with the missile propulsion subsystem.[4] The motor was 100% complete in Utah and comprised approximately 60% of the propulsion subsystem. The director of contract policy implementation for Hercules testified at the formal hearing before the Tax Commission that "[w]hen we finish a motor, we complete it to a drawing. It's not a usable motor at that point, but we complete all the operations that Bacchus is responsible for. Then Lockheed will sign off and say, 'We accept this motor.'" No motor is functional without some way to "turn it on." Hercules sold Lockheed a completed missile motor. Lockheed combined it with other components necessary to "turn it on." The manufacturing of the missile motor was completed at Hercules' Bacchus facility. The manufacturing of the propulsion subsystem and ultimately the entire missile was completed at the destination facility. The tangible personal property contracted for by Hercules and Lockheed, and the subject matter of the sale generating the business income to be apportioned, was the missile motor as it left Hercules' Bacchus facility.[5]

---

4. We reemphasize the difference between the missile motor and the missile propulsion subsystem. The propulsion subsystem consists of the first, second, and third stage motors, firing units, and various other components. Without these additional components, the motor is just as unusable as a car motor before adding the starter, ignition switch, and other components.

5. Hercules bases most of its arguments on the fact that its contractual obligations continued after the motor left the Bacchus facility. The subcontract between Hercules and Lockheed was for the sale of property and services. Hercules' post-sale contractual obligations were mainly for services and are listed in the subcontract under the heading "Technical Support Services." The only issue before us is the apportionment of business income generated by the

The trial court's findings with respect to the property are clearly erroneous.

Section 59-13-93 of UDITPA states that sales of tangible personal property are in this state if "the property is delivered or shipped to a purchaser within this state regardless of the f.o.b. point or other conditions of the sale." Utah Code Ann. § 59-13-93 (1967). Giving no regard to the f.o.b. point or other conditions of the sale, the sale in this case is a Utah sale if "the property is delivered or shipped to a purchaser within this state."

The trial court applied this statutory language to erroneous facts incorrectly concluding the sale at issue in this case was not a Utah sale. Applying section 59-13-93 to the motor as it left Hercules' Bacchus facility leads to only one reasonable conclusion: the sale of the missile motor was a Utah sale. Lockheed received the completed missile motors in Utah and is a Utah purchaser.[6] Under section 59-13-93, Hercules' sale of missile motors to Lockheed is a sale within this state. The trial court's conclusion to the contrary is incorrect.

## CONCLUSION

The Auditing Division of the Tax Commission properly assessed additional Utah Corporate Franchise taxes on Hercules for the years 1977 through 1980. During that period, Hercules sold missile motors to Lockheed. The motors contracted for were the motors as they left Hercules' Bacchus, Utah facility. The buyer, Lockheed, was doing business in Utah and was a Utah purchaser. The sale was hence a Utah sale under Utah Code Ann. § 59-13-93 (1967), and properly included in the sales factor

used to apportion business income under Utah Code Ann. § 59-13-92 (1967). The Tax Commission's apportionment of Hercules' business income generated from the sale of the missile motor was proper under Utah Code Ann. § 59-13-86 (1967).

Accordingly, we reverse the trial court's decision to the contrary.

BILLINGS and RUSSON, JJ., concur.

---

sale of property. The issue of income generated by the sale of services is not properly before us and we do not decide that issue.

**6.** Hercules cites several cases for the proposition that for purposes of determining in which state a sale takes place, the destination or consumption rule should be applied. *See Dep't of Revenue v. Parker Banana Co.,* 391 So.2d 762, 764 (Fla.Ct.App.1980) (a purchaser from outside the state does not become a purchaser within the state merely by sending a representative to pick up the goods); *Olympia Brewing Co. v. Comm'r of Revenue,* 326 N.W.2d 642, 647 (Minn. 1982) (delivery terminates where initial pur-

chaser is located); *Strickland v. Patcraft Mills, Inc.,* 251 Ga. 43, 302 S.E.2d 544, 545 (1983) (court applied destination test to determine where sale to out-of-state customer took place). Each of these cases, however, deals with an out-of-state purchaser coming in state to pick up the subject matter of the sale. In the case before us, it is undisputed that Lockheed is a corporation present and doing business within the state of Utah. Lockheed is a Utah purchaser. Accordingly, we do not reach appellee's Commerce Clause argument because no interstate sale occurred.